ORIGINAL                                                                                          ORIGINAL

**Robert J. Beles** Bar No. 41993
One Kaiser Plaza, Suite 2300
Oakland, California 94612-3642
Tel No. (510) 836-0100
Fax. No. (510) 832-3690

Attorney for *Defendant* PAUL HIRSOHN

### United States District Court
### Northern District of California

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>         *Plaintiff*,<br>    vs.<br><br>PAUL HIRSOHN,<br><br>         *Defendant*. | CR No. 08-229 MMC / JL<br><br>MEMORANDUM IN OPPOSITION TO MOTION FOR DETENTION; EXHIBITS "A" THROUGH "C"<br><br>Date:  April 15, 2008<br>Time:  9:30 am<br>Judge: The Honorable James Larson |

**MEMORANDUM IN OPPOSITION TO MOTION FOR DETENTION**

**1.  Factual Background**

This case arises out of defendant's arrest at the San Francisco airport on January 26, 2008.  Defendant fully cooperated and was extensively interviewed on that day for about 4 hours, during which he gave permission for the government to search his apartment.  Defendant was then released. About a week before March 26, 2008, the government called him in to pick up property and for further interviews, which took about an hour and a half.  The government again called defendant in for further interviews on April 2, 2008.  The interview began at 9:00 am and continued throughout the day.  At 4:00 pm, after long questioning and badgering from the agents, defendant suggested that perhaps he should get a lawyer. The agents terminated the interview because defendant had asked for a lawyer, not because he had refused to answer questions about whether he'd had sexual contact with children, as the government's memorandum claims.

Defendant hired his present lawyer on April 4, 2008.  His lawyer advised defendant thst

1

he would be charged with transporting child pornography and further advised him that there was a five year mandatory minimum for the offense. On April 7, 2008, counsel called AUSA Terek Helou, identified himself as defendant's attorney, and advised AUSA Helou that defendant would surrender at any time.  Defendant was arrested and put in custody on the morning of April 10, 2008.

Defendant had regularly visited his girlfriend Amorn Preekekha in Thailand for the past 10-11 years about two times a year.  His relationship is not a secret.  See Exhibit "A" in which he publicly mentions his Thai girlfriend and their 10 year relationship.

Defendant has worked in the telephone / telcom industry for 28 years.  From 1980 to 2000 he worked for Harris Corporation.  When Teltronix purchased Harris' Private Branch Exchange (PBX) product line, defendant became a consultant for Teltronix, a position that he holds today.  Thus, in effect, defendant has worked steadily at the same job in the telephone industry for 28 years.  During this time, he developed and was granted two software patents.

Defendant has resided at the same apartment that he rented as a graduate student in Berkeley for nearly 30 years.  He has two brothers, Donald Hirsohn, age 54, 1737 Laurel Street, Napa, California, 94555, and Kenneth Hirsohn, 81 Milaw Court, San Ramon, California 94583.  Although the government has advised this court that both brothers have small children, only Donald does -- a boy of 11 and a girl of 8, Heidi, for whom defendant is the godfather. Kenneth's two children are teenagers, a girl of 17 and a boy of 14.  Both brothers completely trust defendant with their children and neither have ever observed anything inappropriate. Donald will be present at the detention hearing.  Kenneth has a prescheduled business meeting that he organized and so cannot be personally present, but his wife Wendy will be personally present.  Both brothers are willing to sign for defendant and post property if necessary.  Donald Hirsohn is willing to act as defendant's custodian if necessary; and defendant's mother is also available to act as custodian. Defendant's employer is located in Rohnert Park, California, and Donald's home is closer to defendant's employment than his own apartment in Berkeley. Defendant's mother is 83 years old and living in Walnut Creek. She is active, mobile, and alert, and would be able to act as custodian.

ORIGINAL                                                                                   ORIGINAL

Defendant has no history of any sort of suicidal behavior. Both brothers visited defendant in custody this past weekend. Both brothers told counsel that defendant appeared to be very much in the present both mentally and physically and does not appear to be suicidal. Defendant's comments that his "life is ruined" and that he "had a good 58 years but it's over" are not threats to commit suicide, but merely recognize that the present prosecution and possible prison sentence will bring significant changes to his previously happy and uneventful life.

Defendant was interviewed on Monday, April 14, 2008 by Dr. Paul Berg, a forensic clinical psychologist with many years of experience. Defendant was upbeat with no signs of suicidal ideation. Dr. Berg's report is attached as Exhibit "B". Dr. Berg's honesty and impartiality are above reproach.

Defendant cannot travel to Thailand without a passport and thus any possibility of flight to Thailand can be prevented simply by requiring defendant to turn in his passport. Counsel are already in possession of defendant's passport and will turn it in to the court at the hearing. The government suggests defendant could go to Mexico or Canada without a passport and then book a flight to Thailand from those countries. In fact, under the U.S. State Department's travel rules, U.S. citizens traveling to Mexico must have a US passport or proof of U.S. citizenship to do so. Since September of 2007, U.S. citizens traveling to Canada have also needed a passport to enter the country.

All of the pornography was found on defendant's personal computer. None was found at defendant's workplace. Thus, to avoid possible misuse of computers, it would be sufficient for the court to order defendant not to use any computers at home.

The government's memorandum makes it appear that all 9 CDs and the computer hard drive contained exclusively child pornography. However, approximately 75% of the material is adult pornography.

The government cites as an example of the danger of releasing a child pornography defendant the case of George Halldin, who the government says "set fire to his office his building and killed himself with carbon monoxide from his car, which he had driven into the building." An article from the San Francisco Chronicle about Halldin's death is attached as

Memorandum in Opposition to Motion for Detention; Exhibits "A" through "C"

Exhibit "C". This shows that the apparent suicide occurred when Halldin's car was parked inside "a two story warehouse at 4:55 am." It was a warehouse, not an office building, and the time of occurrence makes it very likely (and the government does not claim otherwise) that no one else was in the warehouse at the time. The government's argument about the unusual circumstances of Halldin's suicide is far-fetched and has nothing to do with defendant.

### 2. Argument

#### a. Defendant's alleged danger to himself is not a basis for detention under 18 U.S.C. section 3142

21 U.S.C. section 3142 is not a civil commitment statute. "Danger to self" is not a basis for detaining anyone under this statute. The standards for detaining an individual pending trial are found in section 3142(c) – "the appearance of the person as required" and "the safety of any other person and the community." The wording of the phrase "safety of any *other* person" makes it clear that the safety of the defendant is not a concern of the federal detention statute.

The court cannot order a psychiatric examination of a defendant who seeks relief for the purpose of aiding the government in establishing its burden of proof at detention hearing, or to determine appropriate conditions of pretrial release. "Dangerousness must be decided on the basis of the information available at the bail hearing." *United States v Martin-Trigona,* 767 F.2d 35, 36 (2nd Cir. 1985) Under 18 U.S.C. section 3142(f)(2):

> "judicial officers determining whether detention or conditions of release are appropriate must consider 'the available information concerning' the nature of the offense charged, the evidence against the defendant, personal history and characteristics of the defendant (including mental condition and litigation history), and the nature and seriousness of the danger presented by the defendant. Id. § 3142(g). The government bears the burden of proving a defendant's dangerousness by clear and convincing evidence. There is no statutory authority granting a judicial officer the power to order a psychiatric examination of a defendant on the issue of dangerousness. "

*United States v Martin-Trigona,* 767 F.2d at 38. Statutory authority permitting the court to order a medical examination for a suspected narcotics addict to determine if he is an addict does not authorize a psychiatric examination for assessing dangerousness. *Id.* The court did not reach the issue of whether a compelled psychiatric examination to determine defendant's dangerousness would violate his Fifth Amendment right against self-incrimination, since it found that the magistrate lacked the authority to order such an examination. *Id.* While the court may order

that defendant attend counseling or psychiatric treatment as a condition of release after finding that such treatment is necessary to ensure defendant's appearance at trial, *id,* see 18 U.S.C. 3142(c)(1)(B)(x), this would not authorize his examination by a court-appointed psychiatrist to determine dangerousness, nor would it authorize the release of the results of the treatment or treatment notes containing a defendant's statements to the court or the government. In fact, defendant suspects that the government is insisting on such an examination to generate additional statements from defendant.

Defendant is not a flight risk or a danger. There are reasonable conditions of release that will assure his appearance at trial and the safety of the community.

Dated: Oakland, California, Monday, April 14, 2008.

*[signature: Robert J. Beles]*

**Robert J. Beles**
Attorney for Defendant

## '72 Class Notes for Technology Review Jan–Feb 2007, unedited submissions

Dave deBronkart — deBronkart@alum.mit.edu

From **Paul Hirsohn** paulhirsohn@email.com: I am a consultant full time in the Telecom industry. I am writing more telephony software for the same Private Branch Exchange (PBX) product line that was purchased in 2000 from my former employer of 20 years. During my employee years, I was granted 2 software patents. Voice Over Internet Protocol (VoIP) is the current telephony paradigm shift. I have lived in my graduate student apartment in Berkeley for nearly 30 years. I continue to vacation in Thailand in order to spend more time there with my girlfriend May for 10 years. My mother is well, and both of my brothers are raising families in this area. My father passed away a year ago at age 90 after catching a drug resistant MRSA Staph infection. His body and mind had been deteriorating in recent years until he became blissfully unaware of what was happening to him. For me, his passing has been a lesson in the cycle of life. A few years ago, I brought my father to his neurologist appointment. His neurologist said that although everyone ages at their own individual rate, eventually with sufficient age, 100% of people will develop Alzheimer's Disease. I look forward to exchanging news and greetings in person at our 35th reunion in June.



Paul S.D. Berg, Ph.D.
Licensed Psychologist
400 - 29th Street, Suite 315
Oakland, CA 94609
Tel: (510) 893-3413
Fax: (510) 893-3435
PSYBerg@DrPaulBerg.com

April 14, 2008

Robert Belles, Esq.
The Ordway Building
One Kaiser Plaza, Suite 2300
Oakland, California 94612

Re: Paul Hirsohn

Dear Mr. Belles:

In response to your referral I conducted a focused psychological evaluation of your client, Paul Hirsohn. By focused, I am referring to my doing an examination specific to assessing suicidal potential. The examination took place today, April 14, 2008, in Housing Unit 21 at the Santa Rita Detention Facility.

Prior to the examination I had the opportunity to discuss the case with you briefly as well as to review the United States' Memorandum of Law in Support of its Motion for Detention (April 11, 2008).

From that document, I was able to get further background on this case at least in terms of the charges that he may be facing, but more specifically the Government's concern with Mr. Hirsohn's suicide potential were he to be released on bail.

Observations.

Mr. Hirsohn is a medium build, 58-year-old white male. He understood the purpose of my visit and was completely cooperative, although he has a tendency to speak with over detail and some repetition. It was clear that on the one hand he exercises a great concern about his responsibilities, but on the other hand is obviously obsessed with details.

His orientation is good on all spheres and there were no obvious clinical signs of unusual depression, anxiety, nor any indicators of a possible thought disorder.

1

B

Because of the specific purpose of this examination, I did not take a standard history in the sense of reviewing childhood experiences, instead focusing on those dimensions that are known to be possible indicators of suicidal intention.

As I indicated earlier, he is very detail oriented and concerned about meeting his responsibilities. One example of that was his focus on making sure that someone would file his tax return by tomorrow, that none of his periodic bills would go unpaid, that he would do nothing to negatively affect his credit. Obviously, that kind of concern is not consistent with someone who intends to end their life.

It would be foolish to assume that he is not concerned about his legal status vis-à-vis the pending charges, but nonetheless he does not seem to be in total despair. In the Memorandum of Law in Support of it Motion for Detention, the Government cites two specific examples that might give rise to concern about his own safety. It says that during one interview, he stated that his "life is ruined" and that another time he said that he "had a good 58 years but it's over." When I initially read those, they did not automatically indicate to me any suicidal intentionality, and then I specifically asked him about it. He remembers making the statement about his life being over, but explained to me that he meant that his life "as I have known it" is over and it is difficult to disagree with him. When he feels that his "life is ruined," that statement is also very understandable given the seriousness of his charges, the implications that it might have for his freedom, his ability to continue working in his profession, his everyday life.

I asked him specifically whether or not he had any intention to harm himself. He did not even interpret that somewhat ambiguous question to mean end his life, and answered it instead by saying words to the effect that he would never consider hurting himself because he would not want to cause any pain or injuries. This represents one fortuitous example of his not considering suicide.

There are many behavioral and objective elements of his life that are positive factors in mitigating any possible suicidal ideation. In terms of stability, this is a man who has lived in the same apartment for 27 years, always been financially responsible, and has worked for the same company and its successor company for 28 years as well.

Some of the other risk factors are absent. Those include the fact that he is a complete teetotaler, not having a sip of wine since he was 20 years old or so. He has never used any recreational drugs.

Support systems are one of the most important elements in suicide prevention. Based on what he told me, he has an ongoing and viable and positive relationship with his existing family, specifically his mother, and both of his brothers as well as their families including their wives and children.

2

He is obviously a well educated and competent professional. It appears that other aspects of his life have not been as vital or vibrant. While he has some friends, he spends much too much time alone and that obviously has some implications for his interest in pornography.

I discussed the pornography usage with him briefly. I also discussed with him his relationship with the Thai woman, May, but for purposes of this report, I will not reiterate that material.

Insofar as vegetative symptoms, he told me he was not depressed before his detention and his concerns are now situation-appropriate. He told me that he realizes that there will have to be some significant changes in his life, his emphasis being on life and not the ending of life.

There are no reported problems with sleep function, appetite or weight control, no evidence of crying spells, changes in health, nor any indicators of psychotic type of ideation.

I also asked him if he had any type of strategy should his legal situation go badly for him, and he immediately told me that he would get support from those people he loves, again mentioning his immediate family.

My preliminary diagnosis is: Adjustment Disorder with Anxiety. Rule Out: Paraphilia (Pornography Addiction); Personality Disorder (NOS) with features of Obssesive-Compusive and Schizoid

No professional can or should warranty anybody's behavior, but based on my examination, I am confident in stating that he does not present with any unusual degree of suicidal risk. This man is more worried about the bananas in his apartment going bad while he is in detention.

Respectfully submitted,


Paul S.D. Berg
Licensed Psychologist

3

**SFGate.com**

**Possible suicide in fire**
Jaxon Van Derbeken, Chronicle Staff Writer
Sunday, April 6, 2008

(04-05) 21:54 PDT SAN JOSE -- Authorities said today that they investigating whether a businessman facing federal child pornography charges committed suicide while intentionally setting fire early Friday to a warehouse building he owned in San Jose.

Authorities confirmed that George Halldin, 58, was found dead by firefighters. Halldin, who was supposed to have appeared in court Friday to answer allegations that he violated the terms of his February release on the three pornography-related allegations, was found in his car inside the warehouse after the 4:55 a.m. fire.

He was not significantly burned and appeared to have died by smoke inhalation or other means.

Halldin owned the warehouse on Faulstich Court near Oakland Road and ran a business out of the building. At least two businesses, including a plastic injection molding operation, were housed in the structure.

Halldin's wife left him after he was indicted. The couple has two grown children.

Halldin's federal defense lawyer, Nicholas Humy, had no comment on the matter.

Capt. Craig Schwinge of the San Jose fire department said the investigation is focusing both on the cause of the fire and the cause of death. The metal building in the fire remains standing, he said, but an engineer will need to evaluate the structure to determine whether the building is salvageable.

Schwinge said that there was no indication that Halldin left a note. A federal dog team was brought in to determine whether the fire was intentionally set by an accelerant.

Schwinge said firefighters remained at the warehouse all night to make sure the fire did not somehow reignite.

*E-mail Jaxon Van Derbeken at jvanderbeken@sfchronicle.com.*

http://sfgate.com/cgi-bin/article.cgi?f=/c/a/2008/04/06/BAP71OOOE8.DTL

C